**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MISSOURI**
**SOUTHERN DIVISION**

| | |
|---|---|
| JAHN FRANCINE FURSTENAU, | |
| Plaintiff, | |
| v. | Case No. 6:19-cv-03201-NKL |
| ANDREW M. SAUL, Commissioner of Social Security Administration, | |
| Defendant. | |

**ORDER**

Plaintiff Jahn Francine Furstenau seeks review of Defendant's decision denying her claim under Title II of the Social Security Act for disability insurance benefits. For the reasons set forth below, the decision is reversed and the case is remanded for an award of benefits.

## I.   BACKGROUND

On July 15, 2016, forty-six-year-old Furstenau filed for disability insurance benefits, alleging an onset date of March 24, 2015. Tr. 203. The claimant last met the insured status requirements of the Social Security Act on December 31, 2016. Tr. 16. Furstenau alleged in her application that her back pain, leg pain, severe depression, anxiety with panic attacks, degenerative disc disease, lumbar spine fusion, breathing problems, problems sitting/standing/walking/laying down, neuropathy, numbness and tingling in hands, chronic pain, hip problems, memory problems, focus and concentration issues, sleep problems due to pain, and problems bending and twisting would limit her ability to work. Tr. 217, 225.

The Administrative Law Judge ("ALJ") concluded after a hearing that Furstenau had the following severe impairments: lumbar degenerative disc disease, status post surgical fusion;

1

cervical degenerative disc disease, ulnar neuropathy of the left upper extremity; chronic pain syndrome; emphysema; and anxiety and depression. Tr. 16. The ALJ found that Furstenau had the residual functional capacity (RFC) to perform sedentary work, as defined in 20 C.F.R. 404.1567(a), with the following exceptions:

> She could never climb ladders, ropes, or scaffolds, but could occasionally climb ramps and stairs; she could occasionally stoop, crouch, kneel, and crawl; she could frequently handle and finger with the left upper extremity; she needed to avoid concentrated exposure to extreme heat, extreme cold, excessive wetness and humidity, excessive vibration, and respiratory irritants, such as fumes, odors, dust, gases, and poorly ventilated areas; she could perform simple and routine tasks; and she could tolerate occasional and superficial interaction with co-workers, supervisors, and the public.

Tr. 19–20. Based on the testimony of the vocational expert (VE), the ALJ concluded that given Furstenau's RFC, she would be able to perform the requirements of representative occupations such as a document preparer or an addressing clerk. Tr. 25. Therefore, the ALJ determined Furstenau was able to perform work that exists in significant numbers in the national economy and was not "disabled" as defined by the Social Security Act. Tr. 25. The ALJ's decision, as the final decision by the Commissioner, is subject to judicial review.

## II.    LEGAL STANDARD

In reviewing the Commissioner's denial of benefits, the Court considers whether "substantial evidence in the record as a whole supports the ALJ's decision." *Milam v. Colvin*, 794 F.3d 978, 983 (8th Cir. 2015). "Substantial evidence" is less than a preponderance but enough that a reasonable mind would find it adequate to support the ALJ's conclusion. *Id*. "This review is more than a rubber stamp for the Secretary's decision, and is more than a search for the existence of substantial evidence supporting his decision." *Thomas v. Sullivan*, 876 F.2d 666, 669 (8th Cir. 1989). Rather, the Court must consider evidence that both supports and detracts from the ALJ's decision. *Milam*, 794 F.3d at 983. "[A]s long as substantial evidence in the record supports the

2

Commissioner's decision, [the Court] may not reverse it because substantial evidence also exists in the record that would have supported a contrary outcome, or because [the Court] would have decided the case differently." *Andrews v. Colvin*, 791 F.3d 923, 928 (8th Cir. 2015) (quotation marks and citation omitted). However, where the record instead "overwhelmingly supports" a finding of disability, reversal and remand for an immediate award of benefits is the appropriate remedy. *Pate-Fires v. Astrue*, 564 F.3d 935, 947 (8th Cir. 2009).

## III. DISCUSSION

Furstenau challenges the ALJ's determinations as to her mental impairments. Furstenau's arguments focus on the ALJ's treatment of her treating physicians' opinions and her subjective complaints in assessing her mental impairments throughout the five-step sequential evaluation. *See* 20 C.F.R. 416.920(a)(4). First, Furstenau challenges the ALJ's determination at step three in determining that her mental impairments did not meet or equal the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. Second, Furstenau challenges the ALJ's determination of her RFC and his conclusion that Furstenau was capable of adjusting to other work. Doc. 13, p. 10.

### a. Whether the ALJ Failed to Afford the Treating Physicians' Opinions Proper Weight

Ordinarily, treating physician opinions are entitled to significant weight in determining the extent of a claimant's ability. *See* SSR 96-2p West's Soc. Sec. Rulings 111-15 (Supp. 2009) ("In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight."). A treating physician's opinion is not entitled to controlling weight if it is not supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the

Case 6:19-cv-03201-NKL   Document 22   Filed 06/18/20   Page 3 of 26

record. *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000). Even when it is inappropriate to accord the treating physician's opinion controlling weight in light of the record, the opinions "should not ordinarily be disregarded and [are] entitled to substantial weight." *Id*. If an opinion is not given controlling weight, an ALJ will apply the factors listed in 20 C.F.R. § 404.1527(c) to determine how much weight to accord the treating physician's opinion: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) how well the medical source supported her opinion with relevant evidence; (4) how consistent the medical source's opinion is with the record as a whole; (5) whether the medical source was a specialist; and (6) any other factors supporting or contradicting the opinion. 20 C.F.R. § 404.1527(c). If the ALJ decides to discount a treating physician's opinion, she should "give good reasons" for her decision. *Dolph v. Barnhart*, 308 F.3d 876, 878 (8th Cir. 2002). However, an ALJ may not discount a treating source's opinion based on inconsistencies that do not actually exist, *Holden v. Astrue*, 4:10CV742 RWS FRB, 2011 WL 2730914, *37 (E.D. Mo. June 15, 2011), nor may an ALJ "pick and choose" only evidence in the record buttressing her conclusion, *Taylor o/b/o McKinnies v. Barnhart*, 333 F.Supp.2d 846, 856 (E.D. Mo. 2004); *see also Briggs v. Astrue*, No. 11-CV-6039-NKL, 2012 WL 393875, at *6 (W.D. Mo. Feb. 6, 2012) (reversing ALJ determination discounting opinion of treating physician based upon selective reading of physician's treatment notes).

Furstenau submitted the treatment records and medical source statements (MSS) from two of her treating mental health physicians—Dr. Nguyen and Dr. Gill-Taylor. The ALJ gave each of these MSSs "very little weight." Tr. 22. Furstenau argues that the ALJ should have afforded the physicians controlling weight, and that in considering the applicable factors of Section

404.1527(c)(2), the ALJ selectively chose evidence from the record that supported his decision while ignoring evidence that supported the treatment source's opinions.

### i. Dr. Nguyen

Dr. Thuy-Trang Thi Nguyen, a psychiatrist, treated Furstenau beginning on May 2, 2016 through the relevant time period, December 31, 2016, with appointments approximately once every one-to-two months.[1] *See, e.g.*, Tr. 327, 1104, 1142, 1165–66. Dr. Nguyen completed an MSS in January 2017 wherein she determined that Furstenau had substantial mental health limitations due to her major depressive disorder, recurrent and severe without psychotic tendencies, as well as her generalized anxiety disorder. Tr. 386–87. Dr. Nguyen stated that Furstenau would have approximately four bad days per month causing her to miss work and would be off task during even simple tasks for 25 percent or more of the time. *Id*. She found Furstenau to have extreme[2] limitations in carrying out detailed instructions; maintaining attention and concentration for extended periods; performing activities within a schedule, maintaining regular attendance, and being punctual within customary tolerances; working in coordination with or proximity to others without being distracted by them; completing a normal workday and workweek without interruption from psychologically based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods; accepting instructions and responding appropriately to criticism from supervisors; responding appropriately to changes in the work setting; and setting realistic goals or making plans independently of others. *Id*. She found

---

[1] Furstenau's medical records show she has continued to see Dr. Nguyen after December 31, 2016. Tr. 1191, 1206–07, 1227, 1268–69, 1299–1300, 1319, 1344, 1368.

[2] The MSS form defines "extreme" limitation as an "impairment level [that] preclude[s] useful functioning in this category" and leads to "90% overall reduction in performance." Tr. 386. A "marked" limitation is defined as "[m]ore than Moderate, but less than extreme resulting in limitations that seriously interfere[] with the ability to function independently," meaning the individual exhibits "60% overall reduction in performance." *Id*.

5

Furstenau to have marked limitations in understanding and remembering detailed instructions; making simple work-related decisions; interacting appropriately with the general public, getting along with coworkers or peers without distracting them or exhibiting behavioral extremes; maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness, and travel in unfamiliar places or use public transportation. *Id*. Finally, she found Furstenau had only mild or moderate limitations in remembering locations and work-like procedures; understanding and remembering very short and simple instructions; carrying out very short and simple instructions; sustaining an ordinary routine without special supervision; asking simple questions or requesting assistance; and being aware of normal hazards and take appropriate precautions. *Id*.

The ALJ gave Dr. Nguyen's opinion "very little weight" because (1) the treatment relationship covered "only a small portion of the relevant period," (2) her opinion was "inconsistent with both her own observations and those of other providers, which generally show the claimant to present with intact memory and cognitive function, as well as normal attention, concentration, mood and affect, and instead appears to be based upon the claimant's own subjective complaints," and (3) her opinion was inconsistent with the opinion of non-examining State agency psychological consultant Dr. Akeson. Tr. 22.

As an initial matter, Dr. Nguyen saw Furstenau regularly for eight of the twenty-one months of the relevant period, with appointments lasting up to an hour, during which she engaged in psychotherapy as well as began and adjusted a substantial medication regimen. *See, e.g.*, Tr. 327, 1104. The ALJ has not explained how this is such a limited relationship as to discount Dr. Nguyen opinions especially since her opinion is largely consistent with other mental health providers who have also treated Furstenau.

6

The ALJ also stated that Dr. Nguyen's opinion was "inconsistent with both her own observations and those of other providers, which generally show the claimant to present with intact memory and cognitive function, as well as normal attention, concentration, mood and affect." Tr. 22. The ALJ appears to be referring to the mental status assessments that Dr. Nguyen and other physicians treating Furstenau's physical ailments documented during her visits.

During and after the relevant time period, Dr. Nguyen's notes indicate that at her appointments, Furstenau was oriented to person, place, date, and situation, that her attention/concentration was focused or fair, that her thought process was normal, that her judgment was fair, and that her memory was intact. *See, e.g.*, Tr. 327, 1104, 1142, 1165–66, 1191. However, the fact that Furstenau could focus during her thirty-to-sixty minute psychotherapy appointments with Dr. Nguyen is not inconsistent with Dr. Nguyen's determination that Furstenau was extremely limited in carrying out detailed instructions and the ability to maintain attention and concentration for extended periods or markedly limited in the ability to understand and remember detailed instructions. These notes do not mean that Furstenau had the capacity to maintain attention and concentration for extended periods of time. Moreover, contrary to the ALJ's contention, none of Dr. Nguyen's notes state that Furstenau had a normal mood and affect. Rather, Dr. Nguyen's mental status exams consistently indicate that Furstenau appeared with a depressed or anxious mood including at times with psychomotor agitation,[3] that her insight was often impaired, and that

---

[3] At the hearing, the ALJ noted the psychomotor agitation to Furstenau:

| | |
|---|---|
| ALJ: | I notice that you're shaking. |
| Furstenau: | I'm sorry. |
| ALJ: | Your leg. Now, what triggers this? |
| Furstenau: | Just being in this room with you people. |
| ALJ: | Just kind of nervous? Okay. |
| Furstenau: | My problem is, and I know this is not logical in my head, but, my problem is that I'm very fearful people will hurt me, and I always know where that door is, and I just don't want to be – and, I mean no offense, but, I don't |

7

she was frequently tearful, had poor eye contact, or held her head in her hands. *See* Tr. 327, 1089, 1104, 1142, 1165–66, 1206–07, 1227, 1299–1300, 1319, 1344, 1368.

Although the ALJ only cites to one treatment note from "other providers" to support this contention that Dr. Nguyen's MSS is inconsistent with their observations, Furstenau acknowledges that there are instances in the record when during an appointment she appeared to have normal mood, affect, motor activity, or thought process. *See, e.g.*, Tr. 420, 513, 539.

Contrary to the ALJ's characterization, the Court was only able to find seven examples in the record of a provider finding that Furstenau displayed a "normal mood and affect" and upwards of forty instances of providers describing Furstenau's mood and affect as depressed and/or anxious, further supporting Dr. Nguyen's diagnosis and assessment. Moreover, the treatment notes from other providers do not always capture the full context evinced by the record. For example, at a January 2016 appointment with her primary care provider Dr. Yantis, Furstenau was described as alert, well appearing, in no distress, and orientated to person, place, and time, yet she was also described as positive for depression, positive for malaise/fatigue, nervous/anxious, with a depressed mood, and tearful at times. Tr. 345. At another appointment in March 2016 with Dr. Yantis, Furstenau was similarly described as alert, well appearing, in no distress, and oriented to person, place, and time. Tr. 337. However, that same treatment note states that Furstenau was again positive for malaise/fatigue, positive for depression, with a depressed mood and affect as well as poor hygiene. *Id.* In July 2016, a nurse practitioner noted that Furstenau exhibited a normal mood/affect and behavior, yet just a few hours later her psychologist Dr. Gill-Taylor described

---

want to be around you people, and I don't want – I don't want you looking at me, and I don't want you talking to me, and just would really rather not be here.

Tr. 71–72.

Furstenau as having an anxious and depressed mood and affect. Tr. 319–20. Again, in October 2016, treatment notes from Dr. Yantis describe Furstenau as alert, well appearing, in no distress, and oriented to person place and time, yet she had a depressed mood and affect, was positive for depression malaise/fatigue, and she reported low energy and short term memory issues. Tr. 554–55. In December 2016, Dr. Yantis noted that Furstenau exhibited normal mood, behavior, and thought process, and was alert and well appearing, and yet Dr. Yantis also noted that she was positive for depression. Tr. 606. An ALJ may not cherry-pick from the treatment notes and fail to take into account the record as a whole.

Further, as with Dr. Nguyen's mental status exams, the fact that Furstenau is able to focus and appear concentrated during short medical appointments does not mean that she has the capacity to maintain attention and concentration for extended periods of time or throughout a workday. The Social Security Program Operations Manual System ("POMS")[4] notes,

> We must exercise great care in reaching conclusions about your ability or inability to complete tasks under the stresses of employment during a normal workday or work week based on a time-limited mental status examination or psychological testing by a clinician, or based on your ability to complete tasks in other settings that are less demanding, highly structured, or more supportive. We must assess your ability to complete tasks by evaluating all the evidence, with emphasis on how independently, appropriately, and effectively you are able to complete tasks on a sustained basis.

POMS DI § 34001.032(C)(3). A claimant "must have the ability to perform the requisite acts day in and day out, in the sometimes competitive and stressful conditions in which real people work." *Thomas v. Sullivan*, 876 F.2d 666, 669 (8th Cir. 1989). The fact that Furstenau was able to remain concentrated during her healthcare appointments should not have been used by the ALJ to discard

---

[4] The POMS is a source of information used by Social Security employees to process benefits claims. "Although POMS guidelines do not have legal force, and do not bind the Commissioner, [the Eighth Circuit] has instructed that an ALJ should consider POMS guidelines." *Shontos v. Barnhart*, 328 F.3d 418, 424 (8th Cir. 2003).

9

Dr. Nguyen's opinion that Furstenau is not capable of maintaining attention and concentration for extended periods of time. *See Briggs*, 2012 WL 393875, at *6 ("It is the task of the treating physician, not the ALJ, to weigh the importance of various clinical observations and to then use those judgments to develop a final medical assessment.")

Further, the ALJ did not explain why the ALJ concluded Dr. Nguyen's opinion was based only upon the claimant's own subjective complaints. *See Putnam v. Colvin*, No. 6:14-CV-03024-NKL, 2014 WL 5320947, at *4 (W.D. Mo. Oct. 17, 2014) ("While the ALJ conducted a § 404.1527(c) analysis, the analysis was not supported by substantial evidence in the record" where the ALJ failed to point to evidence to support his contention that the treating physician's "opinions were largely based on subjective complaints rather than Plaintiff's medical history and diagnoses and his treatment of her.") Rather, in her MSS, Dr. Nguyen stated that her conclusions were drawn from Furstenau's medical history, clinical findings including mental status examinations, diagnosis, and treatment prescribed with response and prognosis. Tr. 387. By signing the MSS form, Dr. Nguyen agreed to the statement that she had "<u>excluded</u> from consideration all limitations which [she] believe[d] result from the patient's conscious malingering of symptoms, <u>if any</u>." *Id.* (emphasis in original). Further, "[a]ny medical diagnosis must necessarily rely upon the patient's history and subjective complaints." *Brand v. Secretary of Dept. of Health, Educ., and Welfare*, 623 F.2d 523, 526 (8th Cir. 1980). *See also Winning v. Comm'r of Soc. Sec.*, 661 F. Supp. 2d 807, 821 (N.D. Ohio 2009) ("[P]sychology and psychiatry are, by definition, dependent on subjective presentations by the patient. Taken to its logical extreme, the ALJ's rationale for rejecting [the physician's] conclusions would justify the rejection of opinions by all mental health professionals, in every case.") Thus, the Court finds that there is not substantial evidence in the record as a whole

for the ALJ to conclude that Dr. Nguyen's opinion is not entitled to substantial weight because she relied on information provided by Furstenau.

The ALJ also stated that Dr. Nguyen's opinion was inconsistent with the opinion of non-examining state agency psychological consultant Dr. Akeson, "whose opinion is generally consistent with the objective evidence as a whole." Tr. 22. In September 2016, Dr. Akeson reviewed Furstenau's medical file, which included Furstenau's account of her symptoms and daily activities, MSSs from a prior disability determination, and treatment notes from mental health appointments from 2014–2016. *See* Tr. 115–35. Dr. Akeson stated that Furstenau's allegations of disabling mental health symptoms are "partially consistent with the overall evidence in the file," and that although "it is reasonable that she has some [mental health] limitations related to the past traumatic events which involved her former employer,[5] there is also evidence that at times, she is NOT always totally compliant with her meds." Tr. 124. Further, although Furstenau "reported an inability to function in every mental capacity . . . the evidence indicates that she is and would be able to function within at least simple type tasks in non-public environments. She is able to do simple tasks at home, she drives, shops, and spends time with her family." *Id.* Dr. Akeson concluded that Furstenau retained the capacity "to acquire and retain at least simple instructions and to sustain concentration and persistence with at least simple, repetitive tasks" and that she "appears to be able to interact on a limited basis in non public settings and is able to respond and adapt to changes in a non complex workplace." Tr. 132. Based on Dr. Akeson's summary, it appears that only twelve of the documents cited by Dr. Akeson were from the relevant time period,

_____

[5] In 2010, Furstenau was terminated from her position as a Product Supply Manager, where she worked for fifteen years and earned $85,000 per year at the time of her dismissal. Furstenau alleges that she was terminated as a "scapegoat for the company's wrongdoing." Doc. 13, p. 51. Furstenau alleges that this incident triggered her depression and anxiety, which led to a gradual decline in her mental health and continues to cause her anxiety. *See* Tr. 61–65, 122–23, 218–19, 324–25.

11

and the file did not include Dr. Nguyen or Dr. Gill-Taylor's treatment notes after July 2016 or their MSSs. *See* Tr. 122–24. The ALJ gave Dr. Akeson's opinion "significant weight" because he "is familiar with the Social Security rules and regulations, and his opinion is generally consistent with the claimant's usual presentation as alert and oriented, with intact memory and cognitive function and normal attention, concentration, mood and affect." Tr. 22.

An ALJ can generally credit other medical reports over that of a treating physician if the other assessments are "supported by better or more thorough medical evidence." *Casey v. Astrue*, 503 F.3d 687, 691–92 (8th Cir. 2007). However, the opinion of a consulting physician who examines a claimant once, or not at all, does not generally constitute substantial evidence. *Vossen v. Astrue*, 612 F.3d 1011, 1016 (8th Cir. 2010); *Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998). Further, the ALJ must not ignore recent evidence consistent with claimant's subjective complaints. *See Frankl v. Shalala*, 47 F.3d 935, 938 (8th Cir. 1995) ("ALJ improperly relied on the . . . 1990 medical progress notes to discredit Frankl's complaints of fatigue to the exclusion of subsequent medical, nonmedical, and testimonial evidence that was consistent with Frankl's complaints of fatigue at the time of the hearing, over a year later.") Here, Dr. Akeson did not examine Furstenau; his summary cites only twelve mental health documents from the relevant time period, including eleven treatment notes and Furstenau's functional report, and the file did not include Dr. Nguyen or Dr. Gill-Taylor's MSSs. *See* Tr. 122–24.

In addition, the reasoning provided by Dr. Akeson was less than thorough. *See* 20 C.F.R. § 404.1527(c)(3) ("[B]ecause nonexamining sources have no examining or treating relationship with you, the weight we will give their medical opinions will depend on the degree to which they provide supporting explanations for their medical opinions.") Dr. Akeson concluded that Furstenau is "NOT always totally compliant with her meds," seemingly referring to an

appointment note in January 2016 during which Furstenau was "upset because she feels she disappointed her PCP when she quit taking her meds." Tr. 123. However, Furstenau points out that during this period she had lost her insurance and was attempting to continue care with new providers, and a treatment note from earlier that day with her primary care provider indicates that the appointment was to "re-establish care." Tr. 398–99. During that appointment, the treatment note shows that Furstenau was positive for malaise/fatigue, positive for depression, and was nervous/anxious with a depressed mood and affect and tearful. *Id*. Further, Dr. Akeson's reliance on the fact that Furstenau is able to perform "simple tasks at home, she drives, shops, and spends time with her family" does not mean that she could engage in full-time work. *See Reed v. Barnhart*, 399 F.3d 917, 923 (8th Cir. 2005) (quoting *Burress v. Apfel*, 141 F.3d 875, 881 (8th Cir.1998)) ("[T]his court has repeatedly observed that 'the ability to do activities such as light housework and visiting with friends provides little or no support for the finding that a claimant can perform full-time competitive work.'" ) Overall, this is not "better or more thorough medical evidence" than Dr. Nguyen's eight-month treatment relationship with Furstenau. *See Davies v. Astrue*, No. 11-3006-CV-S-NKL-SSA, 2011 WL 4349366, at *4 (W.D. Mo. Sept. 15, 2011) (finding an ALJ improperly deferred to state agency report over treating physician "[b]ecause it did not address the opinions of several treating physicians, and heavily weighed subjective non-medical evidence as against the consistent and repeated medical opinions of different treating physicians.")

Finally, Furstenau notes that Dr. Nguyen's opinion is consistent with three other treating providers: psychologist Dr. Gill-Taylor, who also completed an MSS and is discussed more below, as well as Licensed Clinical Social Worker Candace Jones and Dr. Vinodkumar Paddolkar, who each completed an MSS for a prior disability determination. According to Dr. Akeson's review

of Ms. Jones' August 2014 MSS, Ms. Jones found that Furstenau's mental impairment would cause "4+ bad days a month which would require [claimant] to miss work, and would cause [claimant] to be off task 25% of the time with simple tasks" and that Furstenau was "[moderate] to extremely limited in 17/20 areas on the mental MSS." Tr. 119. Similarly, Dr. Paddolkar's July and November 2014 MSS statements noted that Furstenau's "impairment causes 4 bad days a month which would require [claimant] to miss work and would cause [claimant] to be off task 25%+ of the time with simple tasks" and that Furstenau was "[moderately] to markedly limited in 20/20 areas on the mental MSS." Tr. 120. Although the ALJ from Furstenau's prior disability determination discounted these opinions, *see* Tr. 101–02, the fact that multiple providers each reached a similar diagnosis and conclusions regarding Furstenau's limitations across a number of years nonetheless lends support to Dr. Nguyen's similar conclusions here.

Therefore, the Court finds that the ALJ's evaluation of Dr. Nguyen's MSS is not supported by substantial evidence in the record as a whole.

### ii. Dr. Gill-Taylor

Dr. Angela Gill-Taylor, a psychologist, treated Furstenau beginning on November 30, 2015 through the relevant period with appointments approximately every two weeks.[6]  *See* Tr. 314, 316, 319, 322, 323, 333, 338, 339, 343, 346, 744, 761, 771, 780, 798. In an MSS from March 2017, Dr. Gill-Taylor concluded that Furstenau would have up to four bad days per month causing her to miss work and would be off task approximately fifteen percent of the time, even during simple tasks. Tr. 388–89. Dr. Gill-Taylor found that Furstenau would be extremely limited in making simple work related decisions; completing a normal workday and workweek without interruption

---

[6]  Furstenau continued to see Dr. Gill-Taylor after the relevant period ended on December 31, 2016.  *See* Tr. 816, 834, 844, 876, 886, 896, 906, 923, 941, 951, 962, 972, 982, 992, 1010.

from psychologically based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods; responding appropriately to changes in the work setting, and setting realistic goals or making plans independently of others. *Id*. She further found that Furstenau would be markedly limited in understanding, remembering, and carrying out detailed instructions; maintaining attention and concentration for extended periods; performing activities within a schedule, maintaining regular attendance, and being punctual within customary tolerances; working in coordination with or proximity to others without being distracted by them; and maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness. *Id*. Finally, she determined Furstenau would be only moderately or mildly limited in the remaining categories, including remembering locations and work-like procedures; understanding, remembering, and carrying out very short and simple instructions; sustaining an ordinary routine without special supervision; the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes;[7] being aware of normal hazards and taking appropriate precautions; and traveling to unfamiliar places or using public transportation. *Id*.

The ALJ gave Dr. Gill-Taylor's MSS "very little weight" because (1) the treatment relationship covered "only a short portion of the relevant period" (2) her findings were "inconsistent with both her own observations and those of other providers showing generally normal presentation" and appeared to be "based on the claimant's own subjective reports;" and (3) her opinion was inconsistent with Dr. Akeson, whose opinion the ALJ found more persuasive.

---

[7] Dr. Gill-Taylor noted that this assessment could potentially be higher, but that Furstenau avoids people now.

As an initial matter, Dr. Gill-Taylor's treated Furstenau over twelve months with appointments approximately every two weeks. *See* Tr. 314, 316, 319, 322, 323, 333, 338, 339, 343, 346, 744, 761, 771, 780, 798. This is Furstenau's longest treating mental health provider during this time and accounts for over half of the relevant period. The length of the relationship is not substantial evidence to discount Dr. Gill-Taylor's opinions, particularly in light of the ALJ's willingness to give substantial weight to Dr. Akeson's opinion even though he had never examined Furstenau.

Further, it is unclear from the ALJ's analysis and the records cited how Dr. Gill-Taylor's MSS is inconsistent with her own observations. None of the nineteen exhibits listed as examples to support the ALJ's reasoning include Dr. Gill-Taylor's treatment notes.

As to inconsistency with other providers, although the ALJ also appears to apply the same reasoning as applied with Dr. Nguyen that Dr. Gill-Taylor's MSS is inconsistent with the mental status reports which the ALJ describes as "showing generally normal presentation," the same analysis stated above applies here. The fact that Furstenau is able to focus and appear concentrated during short medical appointments does not mean that she has the capacity to carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, work in coordination with or proximity to others without being distracted by them, make simple work related decisions, or complete a normal workday or workweek without interruption from psychologically based symptoms, which Dr. Gill-Taylor concluded were markedly or extremely limited. Tr. 389. Further, Furstenau's ability to be "cooperative" with her medical providers while seeking treatment is not substantial evidence that she has the capacity to complete a normal workday and workweek without interruption from psychologically based symptoms, respond appropriately to changes in the work setting, or set realistic goals or make

16

plans independently of others, which Dr. Gill-Taylor also concluded were markedly or extremely limited. *Id*.

Next, the ALJ discounted Dr. Gill-Taylor's opinion due to its inconsistency with non-examining state agency consultant Dr. Akeson, and for the same reasons stated above with respect to Dr. Nguyen, Dr. Akeson's review of Furstenau's file is not "better or more thorough medical evidence" than Dr. Gill-Taylor's year-long treatment relationship with Furstenau, nor is his limited analysis substantial evidence that Furstenau could perform full-time competitive work. Further, as indicated above, Dr. Gill-Taylor's MSS describing marked and extreme limitations is largely consistent with Dr. Nguyen's MSS as well as consistent with the opinions of two other treating providers prior to the relevant period discussed above. Thus, four treating providers came to largely the same conclusion with respect to Furstenau's limitations.

Finally, the ALJ noted that Dr. Gill-Taylor's MSS appeared to be based on the claimant's own subjective reports. However, by signing the form Dr. Gill-Taylor agreed to the statement that she had "excluded from consideration all limitations which I believe result from the patient's conscious malingering symptoms, if any." *Id*. (emphasis in original). Further, as discussed above, "[a]ny medical diagnosis must necessarily rely upon the patient's history and subjective complaints." *Brand*, 623 F.2d at 526. *See also Eden v. Colvin*, No. 3:15-CV-05099-NKL, 2016 WL 3920459, at *4 (W.D. Mo. July 18, 2016) ("Dr. Wilson is a psychologist who is trained to treat patients like Eden. The fact that her evaluations were based on her sessions with Eden in which Eden discussed her feelings and symptoms with the doctor does not mean that Dr. Wilson's opinion constitutes a wholesale adoption of Eden's complaints.") The ALJ's decision to discount Dr. Gill-Taylor's opinion because it relied solely on Furstenau's subjective complaints is

inconsistent with the nature of mental health treatment as well as the substantial evidence supporting Dr. Gill-Taylor's conclusions throughout the record.

For the reasons discussed, the ALJ's attributing "very little weight" to Furstenau's treating psychologist Dr. Gill-Taylor's MSS, which concluded that Furstenau had substantial limitations in her ability to perform sustained work on a regular and continuing basis, was not supported by substantial evidence.

### b. Whether the ALJ Failed to Afford Furstenau's Subjective Symptoms Sufficient Weight

Furstenau argues that the ALJ afforded insufficient weight to her subjective symptoms. "In assessing a claimant's credibility, the ALJ must consider all of the evidence relating to the subjective complaints, the claimant's work record, observations of third parties, and the reports of treating and examining physicians" as well as "the claimant's daily routine; duration, frequency, and intensity of the pain; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions." *Dipple v. Astrue*, 601 F.3d 833, 836 (8th Cir. 2010) (citing 20 C.F.R. § 404.1529(c)(3); *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984)). An ALJ may discount claimants' complaints if there are inconsistencies in the record as a whole, and the Court must "defer to an ALJ's credibility finding as long as the ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so." *Schultz v. Astrue*, 479 F.3d 979, 983 (8th Cir. 2007) (internal quotation omitted).

The ALJ found that "the claimant's subjective complaints and alleged limitations precluding employment are not fully persuasive." Tr. 23. The ALJ cited the above *Polaski* factors and determined that while Furstenau had been diagnosed with depression and anxiety and "endorsed significant symptoms related to those impairments," she had not required aggressive mental health treatment or psychiatric hospitalization during the relevant time period, and that

18

rather she "managed her symptoms via medication and bi-weekly psychotherapy." Tr. 21. In addition, the ALJ found "she has reported some improvement in her symptoms with medication, often exhibiting normal mood and affect during examinations, and she generally demonstrates normal memory, cognitive function, attention, and concentration, despite often canceling scheduled appointments." *Id.*

As an initial matter, the Court finds that some of the ALJ's characterizations of the evidence in the record are overstated, including that Furstenau "often exhibit[ed] normal mood and affect during examinations," when as discussed above the Court has only been able to locate seven such instances and upwards of forty instances of providers describing Furstenau's mood and affect as depressed and/or anxious. Further, although the ALJ states that Furstenau "often cancel[ed] scheduled appointments," the ALJ only cited to two such examples. One of these exhibits appears to be directly linked to Furstenau's anxiety related to leaving her home. *See* Tr. 1368 (Dr. Nguyen treatment note stating that Furstenau "[o]nly goes places when she has to (i.e. this appointment)" and "doesn't want to be around people," and that "she cancels appointments and keeps rescheduling them, because otherwise, there's no way I'm getting better.") The second was related to issues with Furstenau's insurance, and the context of the treatment note indicates that despite cancelling the appointment Furstenau was nonetheless in distress. *See* Tr. 1268 ("Stated she couldn't start Effexor 'for a little while' due to not being able to get it covered by her insurance. (Consequently canceled an appointment with this writer.) Strongly considered going to the ER, when not on medication at all.") *See* SSR 16-3P (S.S.A. Oct. 25, 2017) ("We will not find an individual's symptoms inconsistent with the evidence in the record [for failure to follow prescribed treatment] without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints.") Defendant cites to two additional

19

instances referring to cancelled appointments, but again one of these examples is directly related to Furstenau's anxiety. *See* Tr. 1165 (Dr. Nguyen treatment note stating that Furstenau "[c]ancelled her appointment with Dr. Gill last week and feels 'super guilty' about this. Stated that she doesn't want to leave her house.")  These four instances describing cancelled appointments is not substantial evidence to justify discrediting Furstenau's complaints of disabling mental health symptoms, particularly as the record reflects that the reasons for the cancellations were primarily caused by those symptoms and therefore support her claims of disability.

Further, although the ALJ cites to exhibits for his conclusion that Furstenau showed "some improvement in her symptoms with medication," in the March 2017 note Dr. Nguyen states that Furstenau noted "a little" change with Zoloft, Tr. 1227, but this was subsequently discontinued "due to intolerable side effect of nausea." Tr. 1230.  Although in October 2017 Furstenau reported that Klonopin "does help," she also reported it "does cause sedation."  Tr. 1344.  She was also tearful throughout the session, describing how her need for isolation was now causing her to avoid even her family, including her newborn grandson.  *Id*.  Furstenau also points out that while the ALJ is correct that during the relevant period she did not require psychiatric hospitalization, subsequently in October 2017 Dr. Nguyen recommended electroconvulsive therapy for her depression, which includes inducing a seizure while the patient is under anesthesia. Tr. 1344.  *See Pyland v. Apfel*, 149 F.3d 873, 878 (8th Cir. 1998) ("[E]vidence concerning ailments outside of the relevant time period can support or elucidate the severity of a condition.")  Viewing the record as a whole, Furstenau's providers have at different times prescribed her at least eleven separate medications to address her mental illnesses, including up to four at one time, alongside regular psychotherapy with two mental health physicians.  Tr. 324, 328.  Despite this treatment,

Furstenau's symptoms limiting her abilities continued. Thus, Furstenau's medication regime is not substantial evidence to justify discounting her subjective symptoms.

In assessing the severity of Furstenau's mental impairments in step three the ALJ also compared Furstenau's reported symptoms with her daily activities. Although "a claimant need not prove she is bedridden or completely helpless to be found disabled," *Reed*, 399 F.3d at 923 (quoting *Thomas v. Sullivan*, 876 F.2d 666, 669 (8th Cir. 1989)), "[a]cts which are inconsistent with a claimant's assertion of disability reflect negatively upon that claimant's credibility." *Johnson v. Apfel*, 240 F.3d 1145, 1148 (8th Cir. 2001). However, the Eighth Circuit has repeatedly reiterated that a claimant's daily living activities do not provide substantial support for a claimant's ability to perform full-time work. *See Reed*, 399 F.3d at 923 ("[W]e must guard against giving undue evidentiary weight to a claimant's ability to carry out the activities incident to day-to-day living when evaluating the claimant's ability to perform full-time work."); *Banks v. Massanari*, 258 F.3d 820, 832 (8th Cir. 2001) ("How many times must we give instructions that [watching television, visiting friends, and going to church] do not indicate that a claimant is able to work full time in our competitive economy?"); *Hogg v. Shalala*, 45 F.3d 276, 278 (8th Cir. 1995) ("We have repeatedly stated that the ability to do activities such as light housework and visiting with friends provides little or no support for the finding that a claimant can perform full-time competitive work.")

When viewing the record as a whole, including the limitations Furstenau placed on such activities, Furstenau's symptoms are not inconsistent with her daily activities and do not provide support for the ALJ's conclusion that Furstenau is capable of full-time competitive work. For example, the ALJ noted that Furstenau reported difficulty paying attention for more than thirty to forty minutes at a time, not finishing what she starts, and general difficulty concentrating and

making decisions, but found this to be inconsistent with her ability to care for her pets, prepare simple meals, perform light household chores, drive independently, go out alone, go grocery shopping, manage her finances, read, use a computer, watch movies, and attend family functions, and therefore she was only moderately limited in this area. Tr. 19. However, Furstenau stated her activities include filling her pets' food bowls, preparing meals under thirty-minutes, spending five minutes wiping down the kitchen counters, spending a few minutes loading the dishwasher or washing machine, using her computer to message her doctors, and spending 10-15 minutes reading news articles. Tr. 235–38. She cannot focus long enough to do crafts or read books. *Id*. Her testimony at the hearing further reflects the limited nature of her daily activities:

> My doctor – I don't really do much, and that's not something that I am like, but my doctor has told me that every day I need to take ten deep breaths, I need to write down three to five positive things, just whatever I can find positive in, and if it's nice outside, I need to go outside and spend ten minutes in the sun. And I try really hard to do those things, and sometimes I just – I just don't, but I try hard to, but to me they seem like they're not enough, and, so I try to do even more. And, so my own personal goals that I try, I'll try to, you know, feed the dogs every day, and I try to wipe down the kitchen counters, and, you know, something to get a sense of accomplishment."

Tr. 72–73. None of these activities require paying attention for more than thirty to forty minutes or extensive concentration. *See Ford v. Astrue*, 518 F.3d 979, 983 (8th Cir. 2008) (ALJ failed to read claimant's daily activities in context and erred in concluding these activities "worked against her" because "[s]he consistently reported being able to do such things as washing a few dishes, ironing one or two pieces of clothing, making three or four meals each week, and reading, and we do not think that these activities are inconsistent with her complaints of pain or with her contention that she is unable to hold a full time job.")

Similarly, the ALJ acknowledged that Furstenau reported difficulties with getting along with and being around others, as well as periodic crying spells and engaging in self isolation, but

found this to be inconsistent with her ability to drive independently, go out alone, go grocery shopping, and attend family functions. Tr. 18. However, even when she attends her mother's family function every six-to-eight weeks, she is only able to stay an hour or two and will retreat to a separate room to be alone when she gets anxious. Tr. 238. Although she at times goes grocery shopping, at the hearing she testified that this generally occurs when she feels "positive and strong" after a therapy session, but that even then she sometimes becomes too fearful of being around other people and goes home before accomplishing the task. Tr. 78. The record reflects that the remainder of Furstenau's outings almost exclusively consist of visits to her doctors, which she still struggles to force herself to do. Tr. 237-238, 296, 324, 340, 1165. Thus, the Court fails to see inconsistencies sufficient to discredit Furstenau's complaints of symptoms, and rather finds that these symptoms are largely consistent with her daily activities as well as the notes and opinions from her treating providers. *See Leckenby v. Astrue*, 487 F.3d 626, 634 (8th Cir. 2007) (ALJ's conclusion that claimant could "do laundry, go shopping, do some cooking, dish-washing and house-cleaning, do errands at the post office, help her children prepare for school and supervise their activities when they return home, watch television, listen to music, use a computer and drive" mischaracterized these activities where claimant only performed limited cleaning activities and needed help during others, needed breaks while shopping, could only watch television or listen to music for short periods due to not being able to concentrate or stay awake, and only drove herself short distances three times per month); *Reed*, 399 F.3d at 923 (finding claimant's complaints of "anxiety and panic attacks, difficulty sleeping, loss of concentration, nightmares and flashbacks, and discomfort when around strangers" were not inconsistent with her daily activities given the limitations involved: "she does 'a little bit of crafts,' but within an hour she is frustrated because of her inability to concentrate; she can make the bed, but not put on fitted sheets; she can do

household chores, but cannot vacuum the floor or clean the bathtub; she can do the laundry but cannot carry the laundry basket; and, while she can go grocery shopping, she does so only 'if forced,' only with her mother-in-law, and only as long as they do not stay long.")

Therefore, viewing the record as a whole, there is not substantial evidence to discount Furstenau's subjective symptoms, which are further supported by Dr. Nguyen's and Dr. Gill-Taylor's MSS statements and treatment notes.

### c. Impact on the RFC Determination

Even assuming without deciding that the ALJ's determination at step three that Furstenau's impairments did not meet the criteria of a listed impairment was within the "zone of choice" permitted, the ALJ's failure to properly consider Furstenau's treating physicians' opinions regarding her work-related mental health limitations as well as her parallel complaints of disabling symptoms, produced an RFC that was not supported by substantial evidence on the record as a whole.

Dr. Nguyen concluded that Furstenau's condition would cause her to have approximately four days of missed work per month and would cause Furstenau to be off task at least twenty-five percent of the time, even with simple tasks. Tr. 386. This is supported by Dr. Nguyen's extreme and marked limitations in the majority of categories regarding Furstenau's sustained concentration and persistence, her social interaction, as well as her ability to adapt. *Id*. Dr. Gill-Taylor similarly found that Furstenau would have approximately four days of missed work per month and would be off task approximately fifteen percent of the time, even with simple tasks. Tr. 389. She similarly concluded that Furstenau was markedly or extremely limited in most categories of sustained concentration and persistence. *Id*. Two of Furstenau's prior treating providers made similar findings. Tr. 119–20. These limitations are further supported by Furstenau's symptoms

and daily activities indicating that she rarely leaves her home due to her anxiety and depression and generally cannot concentrate for longer than thirty to forty minutes at a time.

The ALJ did not include any limitations for absences and determined that Furstenau "could perform simple and routine tasks." Tr. 19–20. At the hearing the ALJ asked the VE if the jobs identified would be available to Furstenau if she was off task fifteen percent of the workday due to an inability to maintain concentration, persistence, and pace, to which the ALJ responded that there would not be general work in the national economy given this limitation, because "that's going to be below what we consider a competitive pace or rate; no work." Tr. 85. Similarly, when Furstenau's attorney asked the VE whether competitive work would be precluded if an individual was absent between two and four times per month due to medical symptoms or if the individual worked between fifteen and thirty percent slower than coworkers due to inability to make decisions or process information quickly, the VE answered that this individual could not sustain competitive work. *Id*.

When properly viewing the treating physicians' opinions and Furstenau's complaints in the context of the record as a whole, the ALJ's conclusion that Furstenau is not disabled and would be able to sustain competitive work is not supported by the evidence. The ALJ did not give "good reasons" for discounting Dr. Nguyen's or Dr. Gill-Taylor's opinions and failed to correctly assess Furstenau's symptoms in light of the entire record, all of which indicated greater limitations that the VE testified would preclude Furstenau from competitive work. Considering this in the context of the record as a whole, Furstenau has demonstrated that the evidence overwhelmingly supports a finding that she is disabled. "Where further hearings would merely delay receipt of benefits, an order granting benefits is appropriate." *Parsons v. Heckler*, 739 F.2d 1334, 1341 (8th Cir. 1984). Accordingly, this case is remanded for award of benefits.

## IV.   CONCLUSION

For the reasons discussed above, the ALJ's decision is reversed and benefits shall be awarded.  This matter is remanded for further proceedings consistent with this Order.

s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated:  June 18, 2020
Jefferson City, Missouri